**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112-0015
212.653.8700 main
212.653.8701 main fax
www.sheppardmullin.com

212.634.3033 direct
kpuvalowski@sheppardmullin.com

August 8, 2016



**VIA HAND DELIVERY AND ECF**

Honorable Loretta A. Preska
United States District Court
500 Pearl Street
New York, NY  10007

Re:   United States v. Davis, et al.
      S3 13 Cr. 923 (LAP)

Dear Judge Preska:

We write on behalf of the Defendants DCM Erectors, Inc. ("DCM"). We submit this letter in advance of the argument for judgment of acquittal on all counts, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. A judgement of acquittal is required if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *U.S. v. Guadagna*, 183 F. 3d 122, 129 (2d Cir. 1999) (citing *U.S. v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). DCM also challenges the sufficiency of the indictment. We have communicated with Sanford Talkin, counsel for Defendant Larry Davis, and he joins in this letter on behalf of his client.

The Defendants are each charged with one count of wire fraud and one count of conspiracy to commit wire fraud. The Government has failed to present sufficient evidence that either defendant committed wire fraud because there is insufficient evidence that either defendant had the requisite intent to commit wire fraud. As an intent to commit wire fraud is a necessary component to finding a conspiracy to commit wire fraud, each defendant should be acquitted of both charges.

In order to meet its burden, the government must prove the three "essential elements" of a wire fraud violation: "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the [] wires to further the scheme.'" *U.S. v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005)). In presenting proof of the requisite scheme or artifice to defraud, the government must show that the Defendants "possessed a fraudulent intent." *U.S. v. Novak*, 443 F.3d 150, 156 (2d Cir.), *cert. denied*, 549 U.S. 997 (2006) (citing *U.S. v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)). This means that, "at a minimum," the government must "prove that defendants

**SheppardMullin**

Honorable Loretta A. Preska
August 8, 2016
Page 2

contemplated some actual harm or injury to their victims. Indeed, only a showing of intended harm will satisfy the element of fraudulent intent." *Id.* (internal quotations omitted). "Schemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes." *Shellef*, 507 F.3d at 108. Thus, application of the wire fraud statute has been "repeatedly rejected where the purported victim received the full economic benefit of its bargain," and there has been no showing that "the deceit affected the victim's economic calculus or the benefits and burdens of the agreement[,] . . . the defendants' misrepresentations pertained to the quality of services bargained for[,]" or exposed the victim to "unexpected financial risk." *U.S. v. Binday*, 804 F.3d 558, 570-71 (2d Cir. 2015).

Here, the government has failed to present any evidence that the Defendants harbored the requisite intent to harm the purported victim, the Port Authority of New York and New Jersey (the "Port Authority"). First, there is no evidence that either defendant made a misrepresentation of any kind to the Port Authority. Second, the record is clear that the Port Authority received the benefit of its bargain with DCM and Mr. Davis, and that any alleged "deceit" on the part of the Defendants had no impact on the Port Authority's economic calculus or exposed it to unanticipated financial risk. The Port Authority's own witness testified that DCM's work was completed, that the work itself was "skilled" and "satisfactory," and that DCM was entitled to the additional payments it received above the original contract prices for its work at One World Trade Center ("1WTC") and the World Trade Center Transportation Hub ("Hub"). Third, the evidence clearly demonstrates the Defendants' good faith belief that they were doing nothing illegal.

First, there has been a complete failure of proof that either defendant made any misrepresentations to the Port Authority. The government alleged that DCM's participation plans submitted for both 1WTC and the Hub misrepresented the involvement of Solera/DCM, JV ("Solera/DCM") and GLS Enterprises, Inc. ("GLS"). However, there is no evidence whatsoever as to who prepared the plans, who submitted the plans on behalf of DCM, or whether anyone involved in creating and/or submitting those documents had knowledge of falsity or any intent to defraud. There is certainly no evidence that Mr. Davis prepared or submitted these plans. Absent any evidence as to the creation of the plans and how they came into the possession of the Port Authority, there is no possibility of sufficiently connecting them to either defendant. Furthermore, there is no evidence that these plans had any bearing on the award of either contract, as the dates on the participation plans that have been submitted all postdate the awards of their respective contracts.[1] Therefore, even were they to contain misrepresentations that could in turn be attributed to the Defendants, they would amount to no more than unactionable (and innocuous) "deceit" under *Shellef*, 507 F.3d at 108; *U.S. v. Regent Office Supply Co.*, 421 F.2d

---

[1] DCM's WTC1 contract is dated no later than October 3, 2007. (GX 1 at 1-2). The DCM WTC1 Participation Plan is dated some time in 2008. (GX 480). DCM's Hub contract is dated May 8, 2009. (GX 2). The DCM Hub Participation Plans are dated April 21, 2010 (GX 481A), October 5, 2010 (GX 481B), and October 31, 2010 (GX 481C).

**Sheppard**Mullin

Honorable Loretta A. Preska
August 8, 2016
Page 3

1174, 1181 (2d Cir. 1970) ("an intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the 'fraudulent intent' required by the statute. If there is no proof that the defendants expected to get something for nothing, or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods.").

Likewise, the Statements of Payment ("SOP") and the Certified Payrolls ("CPR") contained no inaccurate information. The SOPs reported four items for each listed company: 1) the award amount; 2) the amount paid for the current period; 3) the amount paid to date; and 4) an indication of whether the company was "WBE" or "MBE." There is no evidence on the record that any of this information is false in any way. The CPRs list the name of the contractor or subcontractor, the individuals working for that contractor at the site, and the hours and earned wages for those individuals. Neither the SOP nor the CPR make any claim for minority business credit, nor do they state the work for which payment is being sought. Again, none of this information is false in any way — there has certainly been no evidence admitted or testimony solicited that would even suggest otherwise — and even if misrepresentations existed in the SOPs and CPRs, there is no evidence that they could have even remotely caused the Port Authority to suffer any economic harm whatsoever.

Second, there is no evidence that, had any of the alleged misrepresentations actually been made — evidence of which is starkly lacking — they would have had any economic impact on the Port Authority or its ability to make informed economic decisions. No representative from the Port Authority was able to identify any economic impact that could or did result from the Defendants' alleged use of Solera/DCM and GLS as "pass-throughs." Ida Perich, the general manager of the Port Authority's Office of Business Diversity and Civil Rights, without specifying either defendant, testified only that the "use of pass-throughs jeopardizes the integrity of the program, of who this program is targeting to help, minority and women-owned programs." (T98:20-24.) She further stated that her office monitors the "MWBE effort" at the site, and collects reports from the contractors as part of this monitoring. (T88:14-89:11.) Ms. Perich testified that these reports are "ultimately" compiled into an annual report for the Port Authority Board of Directors regarding "how well the agency met its commitment of contracting 12 percent with minority-owned businesses and 5 percent with women-owned businesses." (T89:5-11.) Thwarting a general desire to assist minority and women businesses and making a section of an annual board report somewhat less reliable does not constitute the kind of economic harm that is criminalized under the wire fraud statute.

On direct examination, Mr. Reiss, the Port Authority's Director of World Trade Center Construction, testified only that if a "pass-through" came to Port Authority's attention, it would be referred to the "office of inspector general," but did not elaborate any further. (T149:11-20.) Mr. Reiss also testified that the Port Authority paid DCM nearly $150 million more than its original WTC1 contract price (T167:15-17), and $220 million more than its original Hub contract price (T174:25-175:2). However, there was no testimony by Mr. Reiss or any other

**Sheppard**Mullin

witness that any of these extra costs were a result of, or even connected to, alleged misrepresentations made by the Defendants regarding DCM's minority and women participation goals ("WMBE goals"). On cross examination, Mr. Reiss clarified the true reason for these extra costs — namely, that the Port Authority asked DCM and Mr. Davis to perform extra work. (T184:1-21.) And on redirect, Mr. Reiss actually identified the precise causes of these extra costs: the Port Authority's requested changes to the building plans, construction delays, bad weather (including record snowstorms and Hurricane Sandy), redesign of the 9/11 Memorial, issues with the intumescent paint, and delays in getting curved steel from a vendor in Europe. (T210:6-211:18.) There was no suggestion that any of these extra costs were linked to DCM's MWBE goals, or to any alleged misrepresentations regarding those goals. Mr. Reiss also testified that DCM completed the work it was hired to do, and that "DCM was building the building satisfactorily. They had a skilled crew." (T:184:22-23; T188:25-189:9.) In short, Mr. Reiss's testimony makes it crystal clear that the Port Authority received the benefit of its bargain with the Defendants, and did not and could not have suffered any economic harm as a result of the Defendants' alleged misrepresentations.

Third, the evidence demonstrates that the Defendants acted in good faith and were fully transparent with the Port Authority, a fact borne out by the cooperating witnesses' own testimony. The uncontroverted evidence is that Defendants disclosed the involvement of AC Associates and the transfer of the surveyors from DCM's payroll to GLS's payroll to the Port Authority shortly after the project began. Moreover, the testimony of the government's two cooperating witnesses confirmed that the Defendants acted in good faith. "Good faith is a complete defense to a mail fraud charge." *U.S. v. Alkins*, 925 F.2d 541, 549 (2d Cir. 1991); see also *U.S. v. Knight*, Nos. 09-5195-cr (L), 09-5198-cr (con), 09-5336-cr (con) (2d Cir. Feb. 1, 2012) (affirming jury instruction that "good faith on the part of a defendant is a complete defense to a charge of mail or wire fraud."). Mr. Garcia testified that during his recorded conversation with Mr. Davis (which occurred in November 2011, right in the middle of the conspiracy period), Mr. Davis explained that he could not pay his subcontractors, including Solera/DCM, because the Port Authority was not paying DCM, and that Mr. Davis planned to inform the Port Authority that Solera employees would be put on the Solera/DCM payroll so they would have a better chance of getting paid. (T497:3-498:9.) Likewise, Ms. D'Aloia testified unequivocally that she believed that she had done nothing wrong prior to her second meeting with government investigators.

> Q: Isn't it a fact that they convinced you during that interview that you just didn't do enough to supervise them? Isn't that true?
> A: Yes.
> Q: Before that day, Ms. D'Aloia, isn't it true that you thought what you were doing was perfectly fine?
> A: Yes.

# SheppardMullin

Honorable Loretta A. Preska
August 8, 2016
Page 5

(T809:15-810:19.)  This evidence irrefutably demonstrates the Defendants' good faith belief that they had nothing to hide from the Port Authority, and were making their best efforts to meet their contractual WMBE obligations.

Finally, the Defendants challenge the sufficiency of the Indictment returned against them. "A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *U.S. v. Pirro*, 212 F. 3d 86, 91 (2d Cir. 2000) (citing *Jones v. U.S.*, 526 U.S. 227, 232 (1999); *Hamling v. U.S.*, 418 U.S. 87, 117 (1974)).  The Indictment is insufficient because it too fails to allege the Defendants' intent to cause economic harm the Port Authority — a requisite element of wire fraud.  The Indictment alleges that DCM "fraudulently claimed MBE credit for One WTC and the WTC Hub in excess of $70 million based on the value of work Solera/DCM purportedly performed for the World Trade Center Project" and "fraudulently claimed WBE credit for $6.3 million of surveying and payroll management work GLS purportedly was performing as a subcontractor to DCM on One WTC and the WTC Hub." (Dkt. No. 38 at ¶¶ 12, 15.)  The Solera/DCM allegation is insufficient because there is no valuation of MBE "credit" or any explanation as to how this "credit" amounts to a property right of the Port Authority such that the Defendants could possibly come by it by fraud.  The GLS allegation is insufficient for the same reason, and for the additional reason that it states GLS did not perform payroll management work, when it is undisputed that GLS did perform this work.  Indeed, the government elicited this testimony from Ms. D'Aloia throughout her direct examination.  Without an allegation that the Defendants' intended to cause the Port Authority some cognizable economic harm the Indictment fails to allege a requisite element of the wire fraud offence and must be dismissed.

For the forgoing reasons, Defendants DCM Erectors, Inc. and Larry Davis respectfully request the Court enter a Judgement of Acquittal on all counts and dismissal of the Indictment.

Respectfully submitted,

Sarah E. Aberg
Kevin R. Puvalowski

for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

cc:  AUSA Kan Nawaday
     AUSA Robert Boone
     Sanford Talkin, Esq.